The **PENNSYLVANIA RAILROAD COMPANY**

v.

**READING COMPANY.**

Civ. A. No. 19015.

United States District Court
E. D. Pennsylvania.
June 30, 1955.

Robert V. Massey, Jr., Gordon W. Gerber, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., Windsor F. Cousins, Philadelphia, Pa., of counsel, for plaintiff.

John R. McConnell, Thomas B. K. Ringe, Philadelphia, Pa., H. Merle Mulloy, William I. Woodcock, Jr., Philadelphia, Pa., of counsel, for defendant.

CLARY, District Judge.

This action is one to restrain the Reading Company from constructing and operating railroad facilities into the plant of the Philadelphia Electric Company, located near Cromby, Pennsylvania, on the west bank of the Schuylkill River, one mile north of Phoenixville, Pennsylvania. The complaint was filed on May 19, 1955; an answer was filed on June 8, 1955, and final hearing was held on June 9th and 10th, 1955. An order of this Court was entered in this case on June 14, 1955 denying plaintiff's motion for an injunction and dismissing the complaint. The reasons therefor will be discussed in this opinion.

The Schuylkill valley, extending from Philadelphia to above Reading, Pennsylvania, is a highly developed industrial area. The earliest industrial transportation through the valley between Philadelphia, Reading and the anthracite coal regions of central Pennsylvania was inaugurated in 1820 via a canal built and operated by a wholly-owned subsidiary of defendant Reading Company. The Reading Company itself was first chartered in 1833, began work on its main line between Reading and Philadelphia in 1835, and began operations between Philadelphia and Reading in 1839. Since that time it has provided the valley with complete multiple line railroad service consisting of passenger, freight, mail and express. The canal above referred to was operated by the Schuylkill Navigation Company and was in operation between Philadelphia and Reading from 1820 to 1927. In 1947 the canal property was turned over to the Commonwealth of Pennsylvania to enable the Commonwealth to carry out the Schuylkill River desilting program. Part of the land so turned over by the Schuylkill Navigation Company was acquired from the Commonwealth of Pennsylvania by the Philadelphia Electric Company for its Cromby plant on July 9, 1951.

The Pennsylvania Railroad Company's Schuylkill branch was opened for operation in 1883 between Frazier and Phoenixville and in 1884 was completed between 52nd Street, Philadelphia, and Reading, Pennsylvania. It is a single track branch line with passenger service operating only as far as Norristown. From Norristown to Reading only freight service is supplied. At different places in a relatively short distance as the Schuylkill River meanders through the valley, each railroad crosses and recrosses it via bridges. Each railroad serves the industrial plants adjacent to its lines and in a 20 mile area of the valley wherein Cromby is located, both railroads have sidings into fourteen large industrial plants. Each renders simultaneous siding delivery service to these same plants. Although Reading Company with its main line was serving

the valley for a period of forty-five years before Pennsylvania Railroad Company started its operations via a branch line, for a period of upwards of seventy years both railroads have served the industries located in the Schuylkill valley as need for service arose.

The Philadelphia Electric Company has owned property at Cromby, Pennsylvania, since 1903. Early in the century two small steam units were operated at that site. Due to changed requirements and consolidations the plant was closed in 1928 and demolished. In 1950 the company, recognizing that additional electrical energy would be needed in the valley and in southeast Pennsylvania generally, determined to construct a large plant at its former site. Increased acreage was needed for that purpose and some of it was acquired from the Commonwealth, as aforesaid. The particular site had sufficient water in the river to condense steam for a total of 350,000 kilowatts of generating capacity. Construction was started in 1951 and the first machine went into service in July of 1954. The site is located on the west bank of the Schuylkill River. Adjoining it was the Pennsylvania branch line. In 1952 the Pennsylvania Railroad Company made switching connections at the north and south ends of the plant; the switch at the north end being completed on November 27, 1952, and the switch at the south end being completed on December 19, 1952. The cost of switching connections was $18,545 and supporting tracks were constructed near the site at a cost of $288,529. Since that time the Pennsylvania Railroad has been the only rail carrier serving the plant and its revenue from coal deliveries from June 1, 1954 to May 31, 1955 amounted to $1,042,000.

When the construction of the Cromby plant was decided upon in 1951, the purchasing agent of the Philadelphia Electric Company, Vice-President H. Nedwill Ramsey, visited the Reading Company and urged it to construct a track connection from its main lines on the east side of the Schuylkill River to the projected plant on the west side of the Schuylkill River. The proposed construction was the latest and most efficient type of generating equipment in the Philadelphia Electric Company's system. The plant was designed to operate on bituminous coal. The most economic and advantageous sources of bituminous coal are located in the Fairmont Field, in the northern part of West Virginia, comprising principally the Counties of Monongalia, Marion, and Harrison. Under existing railroad rate conditions the only coal for delivery to the Cromby plant which the Philadelphia Electric Company could then and can now presently purchase originates on the Monongahela Railway. Other mines are served by the Western Maryland Railway and the Baltimore and Ohio Railroad. It was to tap these two latter sources that the Philadelphia Electric Company was interested in obtaining direct railway service from the Reading Company. At that time the projected annual consumption was a maximum of 375,000 net tons. After several conferences between officials of the two companies, the Reading Company declined to make the requested connection. Thereafter, due to conditions arising out of the Korean War situation, the Company determined to install a second machine at Cromby, Pennsylvania. The first machine generated 150,00 kilowatts and the second machine, which will be completed in the Fall of 1955, is designed to generate 200,000 kilowatts, or a total of 350,000 kilowatts for the entire operation. The expected coal consumption for the new operation is 525,000 net tons annually, or a total consumption for the entire station of 900,000 net tons annually. The Cromby plant will consume about 30% of the total bituminous coal requirements of the Philadelphia Electric Company and it will be the third largest generating plant in its entire system.

Some time in 1953 the principal supplier of coal to the Cromby plant undertook a contract to supply an atomic energy commission plant in Ohio with 1,500,000 tons of coal per year. Learning of this and fearing that the supplier would be unable to furnish enough coal to the Cromby plant to keep it in opera-

tion, Mr. Ramsey visited the offices of the Pennsylvania Railroad Company in February of 1954, told officials of that company of the discussions with the Reading Company in 1951, and asked advice as to how the Philadelphia Electric Company might secure delivery of coal originating on the Baltimore and Ohio Railroad to its Cromby plant. He was advised to "see the Baltimore and Ohio Railroad" and inform the officials of that railroad that the Pennsylvania Railroad was "sympathetic and would cooperate". Mr. Ramsey visited the main offices of the Baltimore and Ohio Railroad and interviewed the Vice-President in charge of freight traffic. He received no reply directly from that official of the Baltimore and Ohio Railroad but did receive a letter from H. B. Light, Vice-President of the Reading Company in June, 1954, offering to extend a railroad connection from the Reading Company's main line to the property line of the Philadelphia Electric Company. This offer was made on condition that the Philadelphia Electric Company build connecting trackage on its own property. Mr. Ramsey immediately relayed this information to the Pennsylvania Railroad Company and was requested by that company to do nothing pending discussions between the two railroads, which request Mr. Ramsey honored. A further conference was held in January of 1955, at which time the Pennsylvania Railroad Company requested the Philadelphia Electric Company to appeal to the Baltimore and Ohio Railroad to establish joint rates with it for delivery of coal originating on the Baltimore and Ohio lines to Cromby. The Philadelphia Electric Company refused to make any further overtures to the Baltimore and Ohio Railroad, since a connection with the Reading Company's main line at Cromby would solve all its difficulties. Mr. Ramsey set March 15, 1955 as a deadline for action by the Pennsylvania Railroad Company. He heard nothing from that company and an exchange of correspondence between the Philadelphia Electric Company and the Reading Company ensued, and an agreement was reached by exchange of letters

dated March 31, 1955 and April 4, 1955. The Reading Company then started construction of its connecting trackage which it scheduled for completion at approximately the time set for the beginning of operations of the second unit at Cromby, Pennsylvania. This action to restrain the construction was then filed by the Pennsylvania Railroad Company (hereinafter called "Pennsylvania") against the Reading Company (hereinafter called "Reading").

The proposed track connections which the Court has found will be an industrial spur will start on the main line of the Reading Company's tracks on the east bank of the Schuylkill River approximately opposite the north end of the Cromby plant. It then will curve over part of the desilting basin of the Schuylkill River and cross the Schuylkill by what appears from Exhibit D–3 a 7-abutment bridge. The final abutment of Reading's trackage will be at the edge of and on the property of the Philadelphia Electric Company which has granted a permanent easement to the Reading Company for that purpose. From that point the Philadelphia Electric Company has agreed to construct switching connections on its own property to its already extensive track sidings located entirely within its property. The spur will be 1,877 feet in length. The Reading Company also plans to construct adequate supporting tracks on land already owned by it on the east bank of the Schuylkill River. There are no right-of-way problems involved since all necessary permissions for the construction have been obtained from the Commonwealth of Pennsylvania. There is no necessity for any condemnation of a right-of-way nor will there be any necessity for public financing to complete the construction of the spur.

The law applicable to the instant case is found in Section 1(18), (20), (22) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), (20) and (22), which read as follows:

"§ 1, par. (18) Extension or abandonment of lines; certificate re-

quired. No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment."

"§ 1, par. (20) Issuance of certificate by commission; unlawful extension or abandonment of lines. The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or

(19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both."

"§ 1, par. (22) Construction, etc., of spurs, switches, etc., within State. The authority of the commission conferred by paragraphs (18) to (21) both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

The contention of Pennsylvania is that by the proposed construction, Reading is extending its lines; that before it may extend its lines a certificate of necessity must be secured from the Interstate Commerce Commission under the provisions of Section 1(18), supra; that having failed so to do Pennsylvania is entitled to an injunction halting the construction by Reading under the provisions of Section 1(20), supra. In support of its contention that it is an extension of lines, Pennsylvania points to the length of the spur; the fact that it must cross a river; the cost of the construction— $772,000 of which $533,000 is the estimated cost of the spur, plus an estimated cost of $239,000 for supporting tracks on the east side of the river; and finally that Reading is extending its lines into an "area" presently served by Pennsylvania.

On the other hand, Reading contends that the construction involved in this action is an industrial spur; that it will serve a single customer only, who has requested service; that it has for over one hundred years served the "area" involved in this dispute; that the cost involved is moderate in light of expected revenue (at least $650,000 annually); that it is wholly located within the limits of one State, and, under the provisions of Section 1(22), supra, requires no permission for construction from the Interstate Commerce Commission.

Pennsylvania in presenting its evidence merely showed that the Reading was starting the construction of the rail connections into the Cromby plant; that Pennsylvania had made rail connections with the plant in 1952 and had been the sole rail carrier servicing the plant since that date; its investment in the switching connections and supporting trackage, the amount of revenue derived from its activities in the past year, and rested.

Pennsylvania then contended that Reading was not entitled to introduce any evidence showing its total operations in the Schuylkill valley, nor evidence of any of the details surrounding the proposed construction under the above referred to agreement with the Reading Company, on the ground that such testimony could be properly presented only before the Interstate Commerce Commission in a hearing by the Commission to determine the necessity of the proposed service. The Court, over the objection of Pennsylvania, permitted testimony as to all of the factors surrounding the construction. The contention of Pennsylvania that testimony involving facts surrounding the construction of any railroad extension or spur is not admissible in an action for an injunction to halt proposed construction is without merit.

A reading of the cases touching upon similar disputes clearly indicates that all of the facts have been developed in the lower courts for the purpose of having the trial judge determine whether the proposed construction is actually an extension proscribed by Section 1(20), above referred to, or is a "spur, industrial, team, switching, or side tracks" permissible under Section 1(22), supra. From the facts as developed in the lower courts the decisions have set out the tests or factors which determine whether the construction sought to be enjoined is or is not an extension of lines. In passing upon the identical question here involved, the courts have laid down certain standards which distinguish a spur from an extension of lines. Among these tests are the following:

Will the proposed track connection serve only a single carrier? United States v. State of Idaho, 1936, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070; Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Chicago & Eastern Illinois Railroad Co., 7 Cir., 1952, 198 F.2d 8; Jefferson County v. Louisville & Nashville Railroad Co., Ky., 1952, 245 S.W. 2d 611.

Will the construction provide passenger, telephone, telegraph, loading platform, station or station agent's service? United States v. State of Idaho, supra; Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Chicago & Eastern Illinois Railroad Co., supra.

Is the length of the construction so great so as to be considered in the nature of a branch line? Cases involving the following mileages have been held to be spurs and not extensions. United States v. State of Idaho, supra (9 miles); Missouri, Kansas & Texas Railroad Co. of Texas v. Texas & New Orleans Railroad Co., 5 Cir., 1949, 172 F.2d 768 (1 mile); Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Chicago & Eastern Illinois Railroad Co., supra (3.15 miles); Jefferson County v. Louisville & Nashville Railroad Co., supra (5.75 miles).

Will the connecting trackage be used only for switching service incidental to line haul movement? Detroit & Mackinac Railway Co. v. Boyne City, Gaylord & Aloena Railroad Co., D.C.Mich.1923, 286 F. 540.

Does it invade the territory of another railroad? Chicago, Milwaukee, St.

Paul & Pacific Railroad Co. v. Chicago & Eastern Illinois Railroad Co., supra; Missouri, Kansas & Texas Railroad Co. of Texas v. Texas & New Orleans Railroad Co., supra.

Will it involve special financing or condemnation proceedings? Missouri, Kansas & Texas Railroad Co. of Texas v. Texas & New Orleans Railroad Co., supra.

Is the cost reasonable for an industrial spur in the light of the traffic involved and has the railroad been requested by the customer to give it service? United States v. State of Idaho, supra; Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Chicago & Eastern Illinois Railroad Co., supra.

Will the proposed connection provide service to the single customer similar to that provided other industries in the same area and similarly situated? Texas & Pacific Railway Co. v. Gulf, Colorado and Santa Fe Railway Co., 1926, 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578; Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Northern Pacific Railroad Co., D.C.Wash.1954, 120 F.Supp. 710.

■ It appears to the Court that the proposed construction falls exactly within all of the tests laid down in the decided cases. The present connection will serve only a single plant owned and operated by a long time customer of Reading. Reading has for decades been one of the two carriers supplying Philadelphia Electric Company in the southeastern part of Pennsylvania with bituminous coal. Pennsylvania is the other rail carrier supplying that company and the traffic has been divided between the two on an approximately even basis. In this particular instance, the Philadelphia Electric Company, feeling that it urgently requires the facilities to be supplied by Reading, has requested the connection. It has asked no more and no less service than is given to fourteen large industrial plants within a ten mile radius of the site in question. Therefore, in this case we have the two important features of an industrial spur high lighted by Mr. Justice Brandeis in his opinion in Texas

& Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., supra, that tracks in the nature of an industrial spur either improve the facilities required by shippers already served by the carrier or supply facilities to others who being within the same territory and similarly situated are entitled to like service from the carrier. It is clear from the record that there is no intention on the part of Reading to do anything which would in any wise give this 1,877 ft. spur characteristics of a branch line by supplying passenger, telephone, telegraph, loading platform, station or station agent's service. It is slightly more than one-third of a mile long and will be used only for switching service incidental to line haul movement. It will deliver coal on the siding of a single plant and will serve no industries other than Philadelphia Electric Company. From the exhibits in the case it is patent that no other industries could possibly be located along the line of the proposed spur. That it is not invading the territory of another road is clear from the background of railroad transportation in the Schuylkill valley outlined previously. The cost is reasonable in the light of the contemplated and assured revenue and no special financing or condemnation proceedings are involved. The sum total of all the evidence indicates to the Court that the construction involved incorporates all of the features of an industrial spur only and none of those involve an extension of lines.

Pennsylvania places great reliance upon the decision of Mr. Justice Brandeis in Texas & Pacific Railway Co. v. Gulf, Colorado and Santa Fe Railway Co., supra, in which case he held a proposed new line of tracks 7½ miles in length to be an extension and not an industrial spur. The difference in the facts of that case as compared with this case accounts for the result. Gulf proposed to build a track 7½ miles in length leading into an area never before served by it. Its purpose was to invade "an industrial district" including multiple industries such as cement works, oil refineries and metal works never before served by it.

No industry was located along the proposed 7½ miles line and no territory adjacent to the Gulf line was expected to produce any freight tonnage. The court held that the proposed line was clearly not a spur in the sense that word is commonly used but rather presented all of the characteristics of a branch of a railroad, and a branch is clearly an extension of lines. Other cases cited by Pennsylvania in support of its contention likewise differ on their facts and do not support the result attempted to be here obtained. In Missouri, Pacific Railway Co. v. St. Louis Southwestern Railway Co., 8 Cir., 73 F.2d 21, there was an attempt by a third railroad to invade an industrial area containing multiple industries which was already adequately served by two competing railroads. In Missouri, Pacific Railway Co. v. Chicago, R. I. & P. Ry. Co., 8 Cir., 41 F.2d 188, the defendant railroad attempted to construct a three city block freight depot which it proposed to locate less than two city blocks from a competing railroad. In order to reach the new freight station and the general adjoining area, never before served by it, it would be necessary to cross at grade the main tracks and at least two switching tracks of the plaintiff railroad, causing serious operating difficulties with the movement of 350 to 400 daily trains of the plaintiff railroad. The court there held that, taking all of the factors into consideration including an extension into new territory, the proposed construction would be considered an extension and not an industrial spur. In Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Northern Pacific Railroad Co., supra, the defendant company started construction of its proposed rail facilities after it had applied to the Interstate Commerce Commission for a certificate of convenience and had been refused. The trackage there would have invaded virgin territory adjacent to plaintiff's right-of-way which contained no industries. In Southern Pacific Co. v. Western Pacific California R. Co., 9 Cir., 61 F.2d 732, defendant proposed to construct some 2 miles of track into new and undeveloped territory solely for the purpose of harassing plaintiff railroad. The court held such construction to be an extension and not a spur. Each of the cases cited by Pennsylvania in support of its contention is distinguishable from the instant case and none of them are controlling in this action.

There is support for the conclusions here reached in the construction by Pennsylvania itself of two switching connections within the past decade; the first in the Schuylkill valley and the second in adjoining Chester valley. In 1946 the Publicker industries started the construction of a large plant at Linfield, Pennsylvania, a short distance north of Cromby. The plant was located along the main line of Reading. Pennsylvania's branch was on the far bank of the river. To connect with the plant it was necessary for Pennsylvania to bridge the Schuylkill River. Both railroads started construction of spurs at approximately the same time. Because Pennsylvania had to overpass a public highway it was necessary to obtain a permit from the Commonwealth of Pennsylvania's Public Utility Commission. Reading's spur had, of necessity, in order to reach the plant to cross land owned by the Commonwealth of Pennsylvania. To obtain permission to do so it was necessary to obtain passage of an act by the Pennsylvania legislature which somewhat delayed the Reading construction. However, Reading connected with the plant several months before Pennsylvania and was the first to supply service to that plant. Pennsylvania in that case made no attempt to secure a certificate of necessity from the Interstate Commerce Commission under Section 1(18) of the Transportation Act. While an attempted explanation of its failure so to do was given at the hearing in this case, the explanation must be disregarded. I would indeed be extremely surprised if any counsel for Pennsylvania would advise its operating department to disregard a plain mandate of law if Pennsylvania considered such construction to be an extension of lines. In that case Pennsylvania treated practically identical construction as that in the instant case as an industrial spur only.

Just east of Downington, Pennsylvania, and located along the Reading Company's Chester Valley branch is a Reading spur at Ashford, Pennsylvania, leading into the Bradford Hills quarry. For many years Reading had been the sole connecting line. In 1954 the quarry company found that it needed outlets for its stone in the territory generally covered by the Delmarva Peninsula, served by Pennsylvania, and not by Reading. On request, Reading gave Pennsylvania permission to cross its line at grade for the purpose of running Pennsylvania's industrial spur into the quarry and building its siding to serve the quarry company. Again, Pennsylvania never requested a certificate under Section 1(18) of the Transportation Act. In its application to the Public Utility Commission of the Commonwealth of Pennsylvania, Pennsylvania properly characterized the Bradford quarry siding as an industrial spur. In another somewhat similar case when it ran an industrial spur across the Delaware River from New Jersey into Pennsylvania in 1952 to a new power plant at Martin's Creek, Pennsylvania, Pennsylvania did make application to the Interstate Commerce Commission but only because the construction was not wholly located within one State. Again, Pennsylvania invading an entirely new field, in a different State, characterized, and properly so in the opinion of this Court, its construction at Martin's Creek as an industrial spur only. In that case construction costs exceeded $1,000,000.

Section 1(22), supra, provides that siding connections in the nature of industrial spurs, if located wholly within a single State, may be made without the permission of the Interstate Commerce Commission. Therefore any attempted assertion of jurisdiction over such construction by the Interstate Commerce Commission would be without authority in law. United States v. State of Idaho, supra, is authority for the proposition that any attempted interference by the Interstate Commerce Commission in a controversy involving such a situation is without legal effect and therefore null and void.

It is clear that the basis of this action is an understandable effort on the part of Pennsylvania to preserve its monopoly of freight revenues from the Cromby plant. It has advanced what the Court believes to be a very novel position, to wit: That once any railroad has made siding connections with an industrial plant, no other railroad may without special permission of the Interstate Commerce Commission evidenced by a certificate of necessity make rail connections with that plant. It further contends that this is so despite the need for service of the customer and despite the fact that such connections are located wholly within one State and may be readily made by the adjacent competing carrier. Diligent research has revealed no decided cases in any Federal or State court supporting this contention. On the contrary, the decided cases have been uniform in holding that in a like situation there is no necessity for obtaining any such certificate. Under the plain mandate of the statute the Interstate Commerce Commission lacks jurisdiction in the matter.

In deciding that this construction is an industrial spur, I have not taken into consideration the overwhelming showing of need for the service requested on the part of the Philadelphia Electric Company. Neither have I considered the rather short but highly significant showing of Reading as to the importance of this connection in the scheme of national defense. I have limited my consideration to the single question whether under all the facts the total sum of the evidence reveals an extension of lines or an industrial spur. The record, in the view of the Court, establishes that it is a true industrial spur within the terms of the statute and the decisions of the courts interpreting the statute. A common sense approach to the problem in the light of the history of railroad transportation in the Schuylkill valley dictates the same result. Hence, the order which was heretofore entered declaring the Reading connection with the tracks of the Philadelphia Electric Company at Cromby, Pennsylvania, to be an

"industrial spur", the construction of which is permissible under Section 1(22) of the Interstate Commerce Act without securing a certificate of necessity from the Interstate Commerce Commission.

Requests for Findings of Fact and Conclusions of Law have been submitted by both the plaintiff and defendant.

The Court affirms plaintiff's Requests for Findings of Fact Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13 and 16. The Court denies, as stated, Requests Nos. 11, 14 and 15.

The Court affirms plaintiff's Requests for Conclusions of Law No. 1, and denies Requests Nos. 2, 3, 4, 5 and 6.

The Court affirms defendant's Requests for Findings of Fact Nos. 1 to 22 inclusive, and affirms as Conclusions of Law defendant's Requests Nos. 23, 24 and 25.