**STATE OF GEORGIA, Western & Atlantic Railroad and The Nashville, Chattanooga & St. Louis Railway, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission,
Defendants.**

**Civ. A. No. 6063.**

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 21, 1957.

712

Eugene Cook, Atty. Gen., Robert H. Hall and E. Freeman Leverett, Asst. Attys. Gen., of Georgia, for plaintiff State of Georgia.

E. R. Leigh, Louisville, Ky., William H. Swiggart and William A. Miller, Nashville, Tenn., for plaintiff Louisville & N. R. Co.

James A. Bistline, Washington, D. C., and Edgar A. Neely, Atlanta, Ga., for plaintiff Southern Railway System.

Samuel R. Howell, Washington, D. C., for defendant I. C. C.

James W. Dorsey, U. S. Atty., Atlanta, Ga., Maurice A. Fitzgerald and James E. Kilday, Washington, D. C., for the United States.

Before TUTTLE, Circuit Judge, and HOOPER and SLOAN, District Judges.

TUTTLE, Circuit Judge.

This is a suit under Sections 1336, 1398, 2284 and 2321–2325, inclusive, Title 28 U.S.C.A., to set aside, suspend, annul and permanently enjoin the orders of the Interstate Commerce Commission, hereinafter referred to as the Commission, dated September 4, 1956, and February 12, 1957, in a proceeding entitled Nashville, Chattanooga & St. Louis Railway et al., Construction, Finance Docket No. 18942, reported at 295 I.C.C. 363. The order of September 4, 1956, was accompanied by a report of the same date. The report and orders constitute the action of the Commission, the validity of which is challenged by this suit, and should be read and construed together. Georgia Public Service Commission v. United States, 283 U.S. 765, 771, 51 S.Ct. 619, 75 L.Ed. 1397. Louis-

ville & Nashville Railroad Company was substituted as plaintiff for the Nashville, Chattanooga & St. Louis Railway. The Southern Railway System and the Cincinnati, New Orleans and Texas Pacific Railway Company intervened on the side of the defendants.

The suit raises two questions. The first is whether the proposed new trackage sought to be built by plaintiffs in the vicinity of Boyce, Tennessee, constitutes an "extension of its line of railroad" which would thus give the Interstate Commerce Commission jurisdiction over the matter, and, if so, the second is whether the Commission's refusal to grant a certificate that the present or future public convenience and necessity require or will require the construction of the trackage should be reversed.[1]

The answer to the first question is required by reason of the contention of the plaintiffs that the proposed trackage is not an "extension" under the terms of the Interstate Commerce Act but is rather "an industrial track" to be wholly constructed within a single state and thus is within the exemption provided in Section 1(22).[2]

The basic facts on which the jurisdictional question must be resolved are not in dispute. They are supported by substantial evidence and are therefore not subject to review by this Court. Without our determining precisely what

standard is to be applied by us as to the power of a court to set aside determinations of the Interstate Commerce Commission involving mixed questions of law and fact (cf. Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301), we are faced with the necessity of determining whether under any theory of review the court should set aside the Commission's determination that it had jurisdiction over the subject matter by reason of its decision that the proposed new trackage constituted an "extension of the line" of the plaintiff railroad.

The facts, which may be found more fully developed in the order of the Commission cited above, are briefly as follows:

The area or territory here involved is a triangular tract of land whose base is formed by the mainline tracks of plaintiffs, hereinafter usually referred to as the L & N, and a Southern Railway System subsidiary, Cincinnati, New Orleans and Texas Pacific Railway Company (hereinafter called the Southern), just on the edge of the city limits of Chattanooga, Tennessee. The two sides of the triangle are formed by the Chickamauga Creek on the right or the northeast side, and the Tennessee River on the left or southwest side. The tract is approximately 2½ miles wide at the base and approximately 1½ miles across from the base to the apex. The tracks of the

1. 49 U.S.C.A. § 1(18) provides:
 "(18) After ninety days after this paragraph takes effect no carrier by railroad subject to this part shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this part over or by means of such additional or exended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless

and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 shall be considered to prohibit the making of contracts between carriers by railroad subject to this part, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

2. 49 U.S.C.A. § 1 (22) provides:
 "The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction * * * of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State * * *."

plaintiffs were constructed in the middle of the last century and those of the Southern were, by permission, constructed on the plaintiffs' right-of-way at a later date. The later tracks are to the north of those of the plaintiffs and thus physically stand between the plaintiffs' line and the triangular area. Many years ago the Southern extended a switching or industrial track along the right or northeast side of the triangle to serve several small industries in the area. This is called the "river track." It also, in 1952, built a switch or industrial track along the left or southwest side of the triangle for a short distance to serve a new industry, the Quaker Oats Company. This track extends not from the main line of the Southern but from its switching yard, which at the western end of the base of the triangle effectively blocks access from the plaintiffs' tracks to this area. For some 35 years prior to June 1954 this entire territory, known as the Boyce area, was in the Chattanooga switching district under reciprocal switching arrangements to which the plaintiffs and the Southern were parties. The Southern handled all cars of the L & N to all industrial side tracks in the area for a flat switching charge. This charge was absorbed by the L & N and was not added to the freight charges paid by shippers, who had the benefit of the Chattanooga tariffs.

The construction of river improvements on the Tennessee River gave new and added value to the Boyce tract for industrial sites. Permanent relief from overflow of the area came subsequent to 1939. The construction of Quaker Oats Company signalized the first major recognition of this new factor. Three other industries which the plaintiffs' proposed new trackage is designed to serve are located or are to be located on the Southern's river track previously mentioned, which is at the opposite end of the area. These are all potentially substantial users of rail transportation. The L & N has at all times maintained a team track in the vicinity of Boyce at which it has served such shippers as could advantageously use such facilities. The maximum annual car loadings prior to the advent of the Quaker Oats Company from the entire area were negligible. The anticipated car loadings from the presently existing and projected industries are very substantial. Estimates of gross freight revenues anticipated by the plaintiffs from all the industries increase from $685,867 for the first year, to $1,072,906 the fifth year of operation. The estimated cost of the new trackage is $523,916.

In June 1954 the Southern issued new proposed tariffs which removed the northeasterly portion of the Boyce area, including all of the new industries except the Quaker Oats Company from the Chattanooga switching district. This enabled the Southern to receive in lieu of the prevailing switching charge a substantially higher charge for the service, which the Commission found to be about 20% of the total revenues on line-haul traffic moved by the L & N between their yards in Chattanooga and points throughout the country. This arrangement by the Southern was challenged by a complaint filed with the Commission by the Central of Georgia Railway and others.[3]

The matters involved in that complaint were determined by the Commission in its report and order dated May 4, 1956. The effect of the Commission's order was to require the reestablishment of reciprocal switching in the Boyce area effective August 27, 1956. This order of the Commission was attacked by the Southern Railway System which filed suit in the United States District Court for the Eastern District of Virginia. That Court has recently dismissed that suit and declined to interfere with the order of the Commission. Southern has

**3.** I.C.C. Docket No. 31737, Cramet Inc. v. Alabama Great Southern Railroad Company, et al., consolidated with I.C.C. No. 31677; Central of Georgia Railway v. Cincinnati, New Orleans & Texas Pacific Railway, and I. & S. No. 6284, Rutile Ore—Gulf and South Atlantic Ports, heard on June 7, 1955.

announced its intention to appeal this judgment in order, if possible, to prevent the reestablishment of reciprocal switching arrangement in the Boyce area.

The proposed new trackage would leave the main line of the L & N at a point south of the eastern side of the triangular territory, proceed northerly and cross by an overhead bridge the main line of the Southern. It would parallel the Southern river track where it serves the three industries along the Chickamauga Creek and then turn southwesterly across the untapped midsection of the territory for approximately two miles to the plant of Quaker Oats Company.

After plaintiffs filed their application with the Commission for the certificate of public convenience and necessity, they filed a motion to dismiss based on their contention that such certificate was not required under the statute because, so they contended, the proposed trackage was an industrial track rather than an extension of line. The Commission held hearings on the motion as well as on the merits. It entered its order finding that the proposed trackage was an "extension" as contemplated in Section 1 (18) of the statute, and that thus the Commission had jurisdiction in the matter. It also found that the present and future public convenience and necessity were not shown to require the construction.

■ There is an authoritative guide to aid the Commission and the courts in determining whether additional trackage is an "extension" of the line of the carrier or is a "spur, industrial, team, switching or side track(s)." After discussing the congressional policy expressed in the Transportation Act the Supreme Court said in Texas & Pacific R. Co. v. Gulf, C. & S. F. R. Co., 270 U.S. 266, 46 S.Ct. 263, 266, 70 L.Ed. 578:

"If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the rail-road, within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks."

Thus we find the critical words are "substantially" and "new territory." The first is of course an indefinite word, but it is one whose meaning can be made more definite by reference to the other language in the opinion. "New territory" is also an indefinite expression when applied to a situation where, as here, the applicant carrier's tracks actually impinge upon but do not penetrate the area involved. This term, too, is made more meaningful by other language of the court's opinion.

In the Texas & Pacific case, the Santa Fe commenced constructing new trackage of approximately 7½ miles from a junction on the opposite side of the city of Dallas, Texas, from an industrial area already served by main line and industrial tracks of the Texas Pacific; by air line the nearest tracks of the Santa Fe were some 3½ miles from the area. It was clear that the purpose of this new construction was to tap the rich industrial area and not to serve existing industries along the new line. The cost of the proposed trackage was some half million dollars, certainly quite a substantial sum in 1925. The Texas Pacific sought to enjoin the construction because the Santa Fe had not obtained the certificate from the Commission. The latter road defended on the ground that this was an "industrial track" and not an "extension" of its line. Notwithstanding there was an absence of many of the characteristics of an extension, e. g., express and passenger service, ticket and freight agents, telegraph service, the creation of new routes, and notwithstanding there were present some characteristics of industrial tracks, e. g., an unballasted road, light weight rails, service on a switching basis rather than for additional charge to the shipper from the junction point and the handling exclusively of car load freight, nevertheless

the trial court held that this was an extension. The Court of Appeals reversed and the Supreme Court granted certiorari. In its opinion the court first laid down a rule of construction of the same words with which we are here concerned. Since, in our view of the matter they control our decision in this case, we quote fully the statement and also the reasoning and conclusion reached by the court:

"In support of its contention that the proposed line constitutes an industrial track, the Santa Fe cites instructions differentiating branches from spurs, which are given by the Interstate Commerce Commission in forms long prescribed for accounting purposes. It points also to uses made of these terms in other connections by courts, by the Commission, and by State Legislatures. A truer guide to the meaning of the terms 'extension' and 'industrial track,' as used in paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act, 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources, and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public as well as in benefit; and that when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. See Railroad Commission of State of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371;

The New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; The Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667; Railroad Commission v. Southern Pacific Co., 264 U.S. 331, 44 S.Ct. 376, 68 L.Ed. 713. The act sought, among other things, to avert such losses.

"When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms 'extension' and 'industrial track' become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one state.' Tracks of that character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions, which the state regulating body is peculiary [sic] fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension

of the railroad, within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. * * *" Texas & Pacific R. Co. v. Gulf C. & S. F. R. Co., 270 U.S. 266, 277, 278, 46 S.Ct. at page 266.

 Thus we find that though the court finally made the test the *substantial* extension into *new territory*, much meaning was given to these words by the court's statement of the purpose of the statute. We think it clear that if the proposed construction offers a substantial threat to a "preservation of the earning capacity, and conservation of the financial resources" of either the proponent of the new trackage or of the existing carrier it may become "a matter of national concern"; if there is a substantial doubt that "the property employed" (and this must mean the property employed by both the new and the old carriers) will "earn a reasonable return," or that it constitutes an unneeded duplication and that "the building of unnecessary (i. e., duplicating) lines involves a waste of resources" whose burden "may fall upon the public"; and if the type of competition that would result "may result in harm to the public as well as in benefit," or that the injury to its rival may cause the public ultimately to bear the loss then the Act sought, among other things, to avert such results. This is the clear teaching of the Texas & Pacific case.

In its conclusions and findings the Commission said:

"Measured by the standard of service ordinarily performed by railroads throughout the country, we believe that the record supports a conclusion that the service accorded by the Southern to the industries in the Boyce area is adequate to meet all the reasonable traffic demands of those industries and, under that cir-cumstance, the proposed extension, costing over one-half million dollars, would be an expenditure of money not in furtherance of the national transportation policy, and would be inimical to the public interest."

This, it seems to us, is a finding of the following facts:

1. Present service is ample for both shippers and the public.

2. The proposed construction would be a duplication of facilities.

3. Such duplication would be an unnecessary expenditure of substantial size not in furtherance of the national transportation policy because it would either jeopardize the stability of earnings of one or the other roads, make unlikely an adequate return for one or the other on its investment or create such competition as would injure one of the two roads, and the harmful effect of such condition would "be inimical to the public interest."

██ We think that when such facts are found by the Commission based on substantial evidence on the record as a whole[4] we may not set them aside. It is clear here that these findings are supported by the evidence. Although these findings were made by the Commission in connection with the merits of the application for certificate of convenience and necessity they stand in the record for whatever purpose they may serve on the jurisdictional question as well. We are unable to avoid the conclusion that findings that the proposed expenditures would merely duplicate present facilities and that such unnecessary duplication would be inimical to the public interest has a bearing on our determination of what is a substantial extension into new territory. It is *new territory* to the L & N because the L & N is not now serving it in the sense in which the court used the word "serve" in the Texas and Pacific case or in the sense in which the Southern is now serving it. It is a *substantial* extension because it involves

4. 5 U.S.C.A. § 1009(e). Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

substantial expenditures and runs a substantial distance. We think that the building of new tracks of significant mileage comes within the jurisdiction of the Commission when it involes a substantial expenditure of funds to duplicate existing adequate facilities to tap an area of industrial potential which it cannot now serve from its own facilities if such expenditure or the competition resulting therefrom might be a burden on the public. This is such a case.

The L & N argues that this territory cannot be new to it because it has always held itself out to serve the area both by the presence of its main line, and the team track (which is all that was needed for a century) and because of the reciprocal switching arrangement between it and the Southern. The fact remains that the L & N does not consider this service adequate; otherwise it would accept the status quo and not now seek to spend a half million dollars to push its track into the area. Moreover plaintiffs do not take the position that the mere existence of a reciprocal switching agreement constitutes such service as would prevent any area covered thereby from becoming a new territory as to a connecting carrier. Since the reciprocal switching agreement does in the broadest sense of the term result in the L & N "serving" all the industries that are on the Southern's industrial track within the switching area, this is an implied admission that the term "serve" in Texas & Pacific means something more than the type of service that is here furnished by it.[5]

We deduce from the facts in the Texas & Pacific case that the use of the word "served" there comprehended serving by means of its own substantial facilities which would be expensive to duplicate. In that sense the L & N cannot claim that it is now "serving" the territory and hence it is not new to it.

Our attention is called by the plaintiffs to the decision by the Court of Appeals for the Fifth Circuit in Missouri, K. & T. R. Co. of Texas v. Texas & N. O. R. Co., 5 Cir., 172 F.2d 768, and Pennsylvania Railroad Co. v. Reading Co., D.C., 132 F.Supp. 616, affirmed, 3 Cir., 226 F.2d 958. The Court held in the first of these cases that new trackage costing only $30,000 to $40,000 extending approximately a mile into an industrial area as to which both roads had been in steadily extending competition through the construction of switch and industrial tracks, was not an "extension" within the Act. In the Reading case the Court held that where both roads had for years parallel lines on opposite sides of the Schuykill River and both repeatedly crossed the river to reach industrial sites, the building of a track and bridge 1700 feet long across the river to reach a single power plant to furnish it a type of service it could not then get from the other road was only an industrial track or spur even though it would cost a very substantial sum.

We have considered these and the other cases cited by the plaintiffs in support of their contentions that we should determine on the record that this is not an extension of the line of the L & N. In light of the finding of the Commission of the basic facts set out above we do not believe that this case is controlled by any of them. We conclude therefore that the Commission had jurisdiction.

■ What has already been said also requires us to deny the relief sought by the plaintiffs on the merits. The granting or denial of such a certificate is a power given to the Interstate Commerce Commission, and if on substantial evidence the Commission makes its determination that the present and future public convenience and necessity do not require the proposed service the courts do not reverse in the absence of legal error contributing to the Commission's

5. We think it appropriate to assume in this discussion that the reciprocal switching agreement is still in force, for undoubtedly the Commission assumed this during the proceedings before it. The Commission's action requiring its continuance now stands unreversed, although on appeal in court.

decision. Here we find that the basic facts heretofore outlined are sustained by the record and no legal error appearing the decision of the Commission must stand.

We have heretofore adverted to the present status of the reciprocal switching agreement whereby the L & N in practical effect obtains much of the advantage it would have from building its own facilities into this area. The court considers the status of this agreement quite relevant to the merits of this controversy. We think it well within the realm of the possible that in the absence of a subsisting reciprocal switching agreement by the terms of which the L & N can compete on substantially even terms with the Southern on shipments into and out of the area in question the Commission would have given favorable consideration to the application of the plaintiffs for permission to build their own tracks. In commenting on this the Commission said:

> "Witnesses for the industries in the Boyce area have not seriously disputed the adequacy of the Southern's service, and their testimony indicates that they want another line of railroad primarily for bargaining purposes. The industries served by the Southern's river track support the application almost entirely for the reason that they are not accorded reciprocal switching. Practically all of their existing difficulties, including adequate transit privileges, will be satisfied if they are accorded reciprocal switching, and that matter is before the Commission and will be determined in an appropriate proceeding."

It has now been determined by the Commission that the reciprocal switching arrangement must be continued and, thus, in the view of the Commission, most of the need for the L & N's service would be satisfied so far as the industries are concerned. Alternatively, if the Supreme Court should reverse the Commission's order restoring reciprocal switching, then quite a different situation would exist from the standpoint of both shippers and competing carriers.

We therefore deny the relief here sought by plaintiffs only in the present state of the records in the two cases. This denial is not conditional, but it is without prejudice to the right of the plaintiffs to present anew their application to the Commission for certificate authorizing them to build the proposed extension in the event that the reciprocal switching agreement now ordered in effect by I.C.C. Docket No. 31737 is later terminated either by the court or by action of the Commission itself.

The prayers of the complaint are denied and the complaint is dismissed.