**GEORGIA SOUTHERN AND FLORIDA RAILWAY COMPANY, Appellant,**

v.

**ATLANTIC COAST LINE RAILROAD COMPANY, Appellee.**

No. 23461.

United States Court of Appeals
Fifth Circuit.

Feb. 16, 1967.

Rehearing Denied March 17, 1967.

H. P. Osborne, Jacksonville, Fla., Peter S. Craig, James A. Bistline, Washington, D. C., for appellant.

Albert B. Russ, Jr., William H. Maness, Jacksonville, Fla., for appellee.

Before TUTTLE, Chief Judge, and BELL and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Georgia Southern and Florida Railway Company (GS&F) and Atlantic Coast Line Railroad Company (ACL) are two railroads whose lines cross in Jasper, Hamilton County, Florida. ACL runs

approximately in a north to south direction, and GS&F runs approximately in a northwest to southeast direction. Somewhat southeast of Jasper and, accordingly, somewhat closer to GS&F than ACL, lies a large area of phosphate deposits. One company, Occidental of Florida, Inc., is now mining those deposits, and another, Owens-Illinois, owns a portion of the deposits but does not mine it.

Before June 23, 1965, neither ACL nor GS&F had any track running to the phosphate deposits. On that date GS&F began construction of a line of track starting from the GS&F main line at a point about 12 miles southeast of the Jasper crossing, running generally northeasterly for about 5.4 miles into the area of phosphate deposits, and ending at Occidental's phosphate plant. This line was completed in October, 1965.[1]

On July 19, 1965, less than a month after GS&F started construction of its new track, ACL began construction of a line of track starting at a point on its main line just north of the Jasper crossing and intended to run about 8.5 miles in a generally southeasterly direction. This would have brought ACL also into the area of phosphate deposits. The new ACL line was to end in the area of the deposits owned by Owens-Illinois, at the site of a plant which Owens-Illinois planned to build. This proposed plant site was about 1.5 miles from the main GS&F track and about 5 miles from the Occidental plant. The GS&F main line actually passes through some of the Owens-Illinois reserves.

On November 2, 1965, GS&F filed a civil action asking the district court to enjoin the ACL construction, under 49 U.S.C.A. § 1(20).[2] GS&F moved for a

1. GS&F built this track without first obtaining a certificate of convenience and necessity from the Interstate Commerce Commission. 49 U.S.C.A. § 1(18) requires that a railroad wishing to construct an "extension" to its track obtain such a certificate. However, GS&F apparently assumed that its new line was a "spur, industrial, team, switching, or side" track, and thus exempted from the requirement of the certificate by 49 U.S.C.A. § 1(22). See footnote 2, infra.

2. 49 U.S.C.A. § 1(20) reads:
"The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph

(18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both."
GS&F claimed that ACL was violating § 1(18), which reads:
"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and, no carrier by railroad subject to this chapter

preliminary injunction, and on the date of the hearing on that motion ACL filed a motion to dismiss for failure to state a claim, with four accompanying affidavits. The court heard testimony from five witnesses and heard oral argument. Several weeks later, on January 27, 1966, the trial judge dismissed the complaint, with prejudice, and made findings of fact and law.[3]

The plaintiff, GS&F, appealed and the trial judge enjoined ACL to preserve the status quo pending appeal.

After submission of the briefs on appeal, and less than a month before oral argument, GS&F filed a motion asking the district court to vacate its final judgment under Fed.R.Civ.P. 60(b). An attached affidavit by counsel for GS&F stated that he had just learned that Owens-Illinois had leased the right to mine its phosphate deposits to Occidental. The obvious conclusion from this statement is that the new facts changed the picture by showing that if ACL were allowed to build its proposed trackage, that would lead to both ACL and GS&F serving the same customer, Occidental.

The district court denied the motion to vacate, and GS&F now appeals that denial. We consolidated the appeal from this motion and the appeal from the original final judgment. We reverse.

## I.

■ The trial court, in granting the motion to dismiss for failure to state a claim, considered matters outside the pleadings; therefore the motion must be considered as a motion for summary judgment.[4] F.R.Civ.P. 12(b) reads in part:

"If, on a motion asserting the defense * * * [of dismissal] for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion *shall* be treated as one for summary judgment and disposed of as *provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.*" [emphasis added]

Rule 56(c) provides in part:

"The motion [for summary judgment] *shall be served at least 10 days before the time fixed for the hearing.* The adverse party prior to the day of hearing may serve opposing affidavits. * * *" [Emphasis added.]

shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

ACL answered that it came in under the exception in § 1(22), which reads:

"The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

§ 1(19) covers the mode of applying to the I.C.C. for the certificate.

3. That opinion is reported at 250 F.Supp. 260 (1966).

4. Finding 13 reads:

"For the reasons hereinabove stated, this Court concludes that Plaintiff's Complaint and the evidence and testimony presented in support thereof, when resolved in a light most favorable to the Plaintiff, fails to establish even prima facie the allegations of invasion of territory. It follows that there is no probability of success and that said Motion for Preliminary Injunction should be denied and said Motion to Dismiss should be granted."

The motion to dismiss and its accompanying affidavits were filed the morning of the hearing on the motion for preliminary injunction. The parties and the trial court treated this hearing as limited to the question of whether the preliminary injunction should issue. The trial judge opened the hearing by saying:

> "Good morning. This is No. 65–349–Civil–J. *It comes on plaintiff's * * * motion for preliminary injunction. * * **

At the close of the hearing, in the course of setting a bond should a preliminary injunction later be issued, the trial court indicated again the limited nature of the hearing:

> "Well, it would seem to me that the case can be reached and disposed of on final hearing, * * * that it could be heard on final hearing within three or four months. * * **"

Nothing said before the hearing indicated that a summary judgment, a final judgment, might result from it.[5] There was no prior notice of the nature of the hearing; there was no notice that affidavits would be filed. In fact, the hearing itself provided no notice of how the oral testimony and affidavits would later be used.[6] The first indication that this material would be used to support a summary judgment was the judgment itself. In sum, there was no hearing on summary judgment at all. The case falls squarely within the rule of Enochs v. Sisson, 5 Cir. 1962, 301 F.2d 125, where we held it an abuse of discretion to grant summary judgment without proper notice and hearing as required by Rule 56.

In Enochs, we cited Bowdidge v. Lehman, 6 Cir. 1958, 252 F.2d 366. That case says in part:

> " * * * Rule 56(c) provides that a motion for summary judgment requires service 'at least 10 days before the time fixed for the hearing.' We think the spirit of the rule requires the same notice and hearing where the court contemplates summary dismissal on its own motion. Since attorney for appellants was given neither notice nor opportunity to be heard upon the question of summary dismissal the judgment was erroneous." 252 F.2d at 368–369.

See Ullah v. Hoy, 9 Cir. 1960, 278 F. 2d 194.

The notice and hearing requirements of Rules 12(b) and 56(c) are far more than formalities. GS&F was cut off from opportunity to present rebutting evidence and argument relevant to the issue of summary judgment. Stated most baldly, GS&F lost its case without a full opportunity to be heard. ACL's

---

5. We are impressed with the following oral remark made by counsel for GS&F in support of the motion for an injunction pending appeal.
> "I point out also that in the third ground we have stated that at no time in these proceedings did the Court indicate or even intimate that the plaintiff would be deprived of an opportunity to fully develop their case upon a final hearing. Quite frankly I would have to submit to candor that my impression was distinctly to the contrary, that I thought that the philosophy of this Court was to permit a full and final hearing upon the merits of this type of controversy." R. p. 344.

6. Cf. Chan Wing Cheung v. Hamilton, 1 Cir. 1962, 298 F.2d 459, 460:
> "Moreover, receiving evidence at the hearing, as distinguished from affidavits or depositions normally required to be filed 'at least 10 days before' (Rule 56(c)), may place the opposing party in an unfair position. There is a substantial difference between accepting matters at the hearing which show that an issue of fact exists, and taking evidence in support of the motion at the last minute when there is no opportunity to rebut."

The First Circuit doubts the propriety of oral evidence in support of summary judgment even at a hearing with proper notice. A fortiori its use to support summary judgment is more dubious in the present case, where there was never notice of how it would be used, and accordingly no true opportunity to rebut it. See 6 Moore, Federal Practice § 56.11[8] at 2206 (2d Ed. 1965).

argument that the hearing on preliminary injunction effectively presented all of the issues which GS&F could or would have presented at a hearing on summary judgment is inapposite, for loss of a motion for preliminary injunction means only temporary lethality. Final judgment is not then a possibility. When such a limited adjudication is the order of the day, we cannot say with assurance that the parties will present everything they have. The very intimation of mortality when summary judgment is at issue assures us that the motion will be rebutted with every factual and legal argument available.

██ The notice requirements of Rule 12 guarantee that the automatic change of a motion to dismiss into a motion for summary judgment will not be accomplished by an unforeseeable thrust with no chance to parry. Notice is ascendant and primary in the Federal Rules. They do not tolerate foils of obfuscation.

## II.

The trial court held, on the merits, that the new construction of ACL was a "spur, industrial, team, switching, or side" track under 49 U.S.C.A. § 1(22) [7] and that, therefore, ACL need not seek a certificate of public convenience and necessity from the Interstate Commerce Commission to build it, as is ordinarily required for building an "extension" under § 1(18).

The Rule 60(b) motion alleges facts which, if true, will change the whole face of this action: if Occidental has leased the Owens-Illinois property so that it is the only company mining the phosphates in the area, then ACL would be seeking to build a line to serve a company already served by another railroad. As we hold that the cause must be reheard, we need not rule on whether GS&F's new allegations alone would justify a Rule 60(b) motion for a new trial. We assume that the matter alleged in the Rule 60(b) motion will be introduced on remand; and because we do not know what effect the new evidence may have, we refrain from ruling explicitly on the merits.

██ However, we feel it proper to say that the trial court's almost exclusive reliance on Pennsylvania R. Co., v. Reading Co., E.D.Pa.1955, 132 F.Supp. 616, aff'd per curiam 3 Cir. 1955, 226 F.2d 958, is misplaced. That case used eight "tests", distilled from former cases construing § 1(22). These tests have no statutory basis, and were developed for a case different from the one before us. But the present case adopts those tests as an exclusive, controlling list of the relevant considerations. We think that the tests are, at most, helpful factors to be considered, and not fiats to be bound by. We disapprove of rubricating such "tests" into talismans of magical power.[8]

7. See Footnote 2, supra.

8. Professor Chafee, in discussing Hart v. Leonard, E & A 1886, 42 N.J.Eq. 416, 7 A. 865, said:

"Justice Dixon [who had attempted to classify and make an exclusive list of situations when equity could by injunction protect and enforce rights in real estate] was attempting to apply in law the logical method of elimination or exclusion, which always charmed us in plane geometry. If the line AB is unequal to CD, it must be so in either of two ways, greater or less. Then we prove it cannot be greater and it cannot be less. Therefore it is not unequal, and AB=CD. The difficulty is that this method is sound only when the classification is exhaustive. The list of excluded possibilities must include all the possibilities, and of this we can rarely be sure in less exact sciences than mathematics. We know that there are only two kinds of inequality, but Justice Dixon could not be sure that there were only nine kinds of equitable relief, especially when he had failed to go outside New Jersey to search for a tenth category. It is the same fallacy into which Darwin fell in attributing the parallel roads of Glen Roy to the action of the sea, because no other explanation he could think of was possible. Then Agassiz propounded his glacier-lake theory, which Darwin had neglected to consider. And, he adds, 'My error has been a good lesson to me never to trust in science to the principle of exclusion.' "This question of Hart v. Leonard

██ We invite the court's attention instead to the classic opinion of Mr. Justice Brandeis in Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe F. Co., 1926, 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578. Justice Brandeis said in part:

"A truer guide [for courts] to the meaning of the terms 'extension' and 'industrial track,' as used in paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act of 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources, and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public, as well as in benefit; and that, when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. * * The act sought, among other things, to avert such losses.

"When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms 'extension' and 'industrial track' become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one state.' Tracks of that character are commonly constructed, either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. * * * But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad, within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal Commission issues its certificate that public necessity and

is very important, for it shows the danger in our system of law which has grown up from concrete cases rather than from abstract reasoning, of using precedents as principles per se and not as illustrations of principle. Equity relieves against torts when the remedy at law is inadequate. It was inadequate in Dixon's nine classes, and may be equally so in a dozen new classes. Of course a different system of law, which is rooted in logic and not in experience, must be on the watch for altogether different dangers."

Professor Chafee has this footnote appended to the internal quotation from Darwin:

"Life and Letters of Charles Darwin, 57 (ed. 1901). I have heard a thoughtful woman argue against gambling thus: There are four ways to obtain money, earning, finding, receiving a gift, stealing. Gambling is neither of the first three. Therefore it is the fourth." Chafee, Progress of the Law-Equitable Relief Against Torts, 34 Harv.L.Rev. 388, 391–392 (1921).

convenience require its construction. * * * " 270 U.S. at 277–279, 46 S.Ct. at 266, 70 L.Ed. at 583–584.

Reversed and remanded.